

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00212-CV

———————————————

LIBERTY BANKERS LIFE INSURANCE COMPANY AND
TX COOLEY SUB III, LLC, Appellants

V.

AIL Investment, L.P., Appellee

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-313850-19

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Liberty Bankers Life Insurance Company conveyed an 81.484-acre tract of land (the Property) to Appellant TX Cooley Sub III, LLC. Following that conveyance, Appellee AIL Investment, L.P.[1] sued Appellants for breach of contract and declaratory judgment, claiming that it had a right of first refusal on the Property and that the Property had been conveyed without Liberty's providing notice or opportunity for AIL to purchase the Property. TX Cooley Sub filed a counterclaim in which it sought a declaration that it was Liberty's "affiliate" such that AIL's right of first refusal was not triggered. AIL and Appellants filed dueling summary-judgment motions on their respective claims and counterclaim, and the trial court denied summary judgment to Appellants and granted summary judgment to AIL on its claims and ordered that TX Cooley Sub take nothing on its counterclaim. The trial court then considered AIL's request for attorney's fees, and as part of the evidence of fees, AIL submitted unredacted fee statements to the trial court for an in camera inspection over Appellants' objection. The trial court ultimately awarded AIL $927,506 in trial attorney's fees, and it also awarded certain appellate attorney's fees unconditionally.

---

[1]In their brief, Appellants identify Appellee as "AIL Investments, LP." Appellee responds that "[t]he proper entity name is AIL Investment [singular], L.P." We note that the subject lawsuit was filed by "AIL Investment, L.P." and that the subject notice of appeal likewise named the party as "AIL Investment, L.P." We have thus styled the case listing "AIL Investment, L.P." as Appellee.

In six issues on appeal, Appellants argue that the trial court erred by making its summary-judgment rulings and abused its discretion by awarding attorney's fees. We will affirm the trial court's summary-judgment rulings, but we will reverse the trial court's awards of attorney's fees and remand for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. AIL's Sale of the Property to Intermodal and AIL's Right of First Refusal

In 2006, AIL sold the Property to Intermodal Container, LLC for $2,300,000. Pursuant to the deed between AIL and Intermodal (the Deed), AIL reserved a right of first refusal pertaining to the Property. According to its terms, the right of first refusal is triggered when "Grantee . . . receives a bona fide offer acceptable to Grantee to buy or makes a bona fide offer acceptable to the offeree to sell all or any portion of the Property." When triggered, AIL has "the right and option, but not the obligation, to purchase . . . the Offered Property."

Notably, AIL's right of first refusal does not apply to a "foreclosure sale," nor does it apply to "a sale of all or any portion of the Property to an affiliate of Grantee." As defined in the Deed,

> [T]he term "affiliate" shall mean as to the Person . . . in question, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person in question. As used in the immediately preceding sentence, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether

3

through ownership of voting securities, partnership interests, by contract or otherwise.

While neither a foreclosure sale nor a sale to an "affiliate" triggers AIL's right of first refusal, the new owner under such a sale would take the Property "subject to" AIL's right of first refusal.

When the right of first refusal is triggered, the "Grantee" is required to provide the "Grantor" with a written notice (the Grantee's Notice) that (1) sets forth the true identity of the proposed purchaser; (2) includes a description of the "Offered Property"; (3) includes a description of all material terms of the proposed transaction, including, without limitation, the price, earnest money, and closing date; and (4) offers to consummate such a transaction with the grantor upon the "same terms and conditions" as set forth in the Grantee's Notice. Upon receipt of the Grantee's Notice, the grantor has thirty days to accept the offer and exercise its right of first refusal.

## B. Liberty's Purchase of the Property at a Foreclosure Sale and Liberty's Subsequent Sale of the Property to TX Cooley Sub

To finance its purchase of the Property, Intermodal borrowed $1,970,880 from Liberty, secured by a deed of trust on the Property. Intermodal later defaulted on its loan, and Liberty pursued foreclosure. In April 2015, Liberty purchased the Property at a foreclosure sale for $973,890.

Later that year, Liberty sold the Property to TX Cooley Sub (the 2015 Sale). Notably, Liberty did not provide a Grantee's Notice to AIL before the 2015 Sale.

4

The purchase price for the 2015 Sale was $1,964,384.52, secured by a deed of trust and vendor's lien on the Property. Liberty and TX Cooley Sub exchanged the following documents as part of the 2015 Sale: a Special Warranty Deed with Vendor's Lien, a Promissory Note, a Loan Agreement, and a Deed of Trust (collectively the 2015 Sale Documents).

Several of the 2015 Sale Documents contain provisions that are pertinent to Appellants' claim in this lawsuit that AIL's right of first refusal was not triggered by the 2015 Sale because Liberty and TX Cooley Sub were "affiliates" at the time of the sale. In this regard, the parties state in the Loan Agreement that "in no event shall [Liberty] be deemed an Affiliate of [TX Cooley Sub]." As defined in the Loan Agreement,

> "Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting interest of such Person, or (c) ten percent (10%) or more of the voting interest of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities, by control, or otherwise; provided, however, in no event shall [Liberty] be deemed an Affiliate of [TX Cooley Sub].

Moreover, the Promissory Note specifically disclaims any "fiduciary or special relationship" between Liberty and TX Cooley Sub, noting the following:

> Relationship of the Parties. Notwithstanding any prior business or personal relationship between [TX Cooley Sub] and [Liberty], or any

5

officer, director or employee of [Liberty], that may exist or have existed, the relationship between [TX Cooley Sub] and [Liberty] is solely that of debtor and creditor, [Liberty] has no fiduciary or other special relationship with [TX Cooley Sub], [TX Cooley Sub] and [Liberty] are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between [TX Cooley Sub] and [Liberty] to be other than that of debtor and creditor.

Further, the Loan Agreement contains the following provision indicating that the agreement did not give Liberty control over TX Cooley Sub:

Lender Not in Control. None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give [Liberty] the right to exercise control over the affairs and/or management of [TX Cooley Sub], the power of [Liberty] being limited to the Right to exercise the remedies provided in the other Sections of this Article.

Finally, the Deed of Trust provides that "[n]either the enforcement of any of the remedies under this Security Instrument . . . nor any other remedies afforded to [Liberty] under the Loan Documents, at law or in equity shall cause [Liberty] to be deemed or construed to be a mortgagee in possession of the Property."[2]

## C. AIL's Suit Against Appellants and TX Cooley Sub's Counterclaim

In 2019, AIL sued Appellants, asserting breach of contract and declaratory judgment claims and seeking specific performance of its right of first refusal in connection with the 2015 Sale. AIL also filed a lis pendens on the Property. Appellants answered the lawsuit, and TX Cooley Sub filed a counterclaim. In its

---

[2]*See Wilhite v. Yount-Lee Oil Co.*, 140 S.W.2d 293, 296 (Tex. App.—Texarkana 1940, writ ref'd) (holding that a mortgagee in possession has the right to retain possession of property until its debt is paid).

counterclaim, TX Cooley Sub requested certain declaratory relief pertaining to AIL's right of first refusal, including declarations regarding "[w]hether or not [the 2015 Sale] constitute[s] a bona fide offer or sale" and "[w]hether or not [TX Cooley Sub] is an affiliate of [Liberty] for the purposes of . . . the Right of First Refusal."

## D. Appellants' Motion for Partial Summary Judgment, the Extrinsic Evidence Attached to the Motion, and the Trial Court's Denial of the Motion

Appellants later filed a motion for partial summary judgment on AIL's claims and on TX Cooley Sub's counterclaim.[3]  In their motion, Appellants argued that AIL's right of first refusal was not triggered by the 2015 Sale because the conveyance was between "affiliates."  Attached to their motion were declarations from the following persons:  (1) Bradford Phillips, Liberty's president; (2) Robert C. Murray, Sr., TX Cooley Sub's sole manager;  and (3) Jay LaJone, Appellants' outside counsel.

In Phillips's declaration, he stated that after Liberty purchased the Property at the foreclosure sale in April 2015, it desired for "the legal title to the Property [to] be held in a separate, affiliated entity."[4]  Thus, Phillips instructed Leah Williams—an alleged "member of Liberty's in-house Legal Department"[5]—to form TX Cooley Sub,

---

[3]The motion was a "partial" motion for summary judgment in that it did not seek relief on TX Cooley Sub's claim for attorney's fees.

[4]At his deposition, Phillips testified that Liberty's practice was to typically transfer any real estate it owned into a "separate single-purpose entity" to limit Liberty's liability.

[5]While Phillips stated in his declaration that Williams was "a member of Liberty's in-house Legal Department," in a declaration made by Williams, she stated

7

which was a subsidiary of TX Cooley Investments, Inc. Phillips then directed LaJone—Liberty's outside counsel—to prepare the 2015 Sale Documents. Phillips stated that the 2015 Sale Documents were executed in December 2015, to be effective July 1, 2015.

According to Phillips, at the time the 2015 Sale Documents were executed, "Liberty had possession of a Stock Power and Purchase Agreement executed in blank by Robert Murray as the sole shareholder of TX Cooley Investments, Inc., which is and was the sole owner of TX Cooley Sub III, LLC." The Stock Power and Purchase Agreement were attached to Phillips's declaration. The Stock Power—which was signed by Murray but not dated—provided, "For value received, Robert C. Murray, Sr., an individual, hereby sells, assigns and transfers unto [Left Blank], a [Left Blank], 1,000 (one thousand) shares of the Common Stock of TX Cooley Investments, Inc." The Purchase Agreement—which was also signed by Murray but not dated— provided that Murray owned all of the stock of TX Cooley Investments and that he desired to sell all of the stock to "Purchaser"—the identity of whom was left blank— for $1,000. A stock certificate indicating that Murray was the owner of 1,000 shares of TX Cooley Sub's stock was also attached to Phillips's declaration (the Stock

that "at all times relevant . . . [she has] been a Senior Paralegal in the in-house Legal Department of Pillar Income Asset Management, Inc." Williams indicated that Liberty was Pillar's client.

8

Certificate).[6] Phillips stated that Liberty transferred the Property to TX Cooley Sub in reliance on Liberty's ability to exercise the Stock Power without condition and that but for the Stock Power, Liberty would not have transferred the Property to TX Cooley Sub.

In Murray's declaration, he stated that "[a]t all times relevant to this Declaration," he had been the president, sole director, and sole shareholder of TX Cooley Investments. He also stated that TX Cooley Investments had been the sole member of TX Cooley Sub and that he had been the sole manager of TX Cooley Sub. He indicated that he had executed the Stock Power, Purchase Agreement, and Stock Certificate in favor of Liberty and that those documents had been delivered to Liberty upon his execution of the documents. He also stated that in December 2015, he had executed the 2015 Sale Documents at Phillips's request. He further said that "[a]t all times relevant to the transfer of [the Property]," he had "acted as an agent/nominee for [Liberty] through TX Cooley Investments, Inc. and its subsidiaries." Murray also indicated that in January 2020, Phillips directed him to execute an assignment of TX Cooley Investment's ownership interest in TX Cooley Sub to Liberty. A document effectuating that assignment was attached to his declaration.

---

[6]Williams testified that after she received the Stock Power, Purchase Agreement, and Stock Certificate, she sent them to Winter Sun Management, Inc. because it handled the accounting for TX Cooley Investments.

9

In LaJone's declaration, he indicated that in December 2019, he sent a Grantee's Notice to AIL pertaining to a potential sale of the Property to a third party, IOV Associates, LLC. He attached the Grantee's Notice to his declaration. He also attached AIL's response to the Grantee's Notice, in which AIL indicated that the notice did not have any effect on AIL's claims in the present lawsuit.

AIL responded to Appellants' motion for partial summary judgment, arguing that Appellants were not entitled to summary judgment because the 2015 Sale Documents reflected that Liberty and TX Cooley Sub were not "affiliates" and that Liberty could not control TX Cooley Sub. Among other things, AIL attached the Deed and certain of the 2015 Sale Documents—the Loan Agreement, the Promissory Note, and the Special Warranty Deed with Vendor's Lien—to its response. The trial court ultimately denied Appellants' motion for partial summary judgment.[7]

## E. AIL's Motion for Partial Summary Judgment, AIL's Motion for Summary Judgment on Remedies, and the Trial Court's Granting of Those Motions

While Appellants' motion for partial summary judgment was pending, AIL filed its own motion for partial summary judgment. Pointing to, among other things, the Deed and the 2015 Sale Documents, AIL argued that it was entitled to summary judgment on its breach of contract and declaratory judgment claims and on TX

---

[7]On the same day that they filed their motion for partial summary judgment, Appellants also filed a motion to expunge the lis pendens. The trial court denied that motion the same month that it denied Appellants' motion for partial summary judgment.

10

Cooley Sub's counterclaim because Liberty had sold the Property to TX Cooley Sub in violation of AIL's right of first refusal contained in the Deed. Appellants responded, incorporating by reference the arguments and evidence contained in their motion for partial summary judgment.[8] Following a hearing, the trial court granted AIL's motion for partial summary judgment.

AIL later filed a motion for summary judgment on remedies, arguing that it was entitled to specific performance as a matter of law. In their response, Appellants argued that AIL had not conclusively established that it was entitled to specific performance. The trial court ultimately granted AIL's motion for summary judgment on remedies.

## F. AIL's Motion for Attorney's Fees, the Trial Court's Denial of Appellants' Objection to the In Camera Submission of AIL's Unredacted Fee Statements, and the Trial Court's Final Judgment

After the trial court granted AIL's motion for summary judgment on remedies, AIL filed a motion seeking the recovery of its attorney's fees. An affidavit from one of AIL's attorneys was attached to the motion, in which she indicated that seventeen different "[t]imekeepers" had billed 2,594.7 hours on the case, with the fees totaling

---

[8]In their response, Appellants also incorporated by reference certain arguments and evidence contained in a second motion for partial summary judgment that they had filed. The trial court denied that second motion for partial summary judgment. Appellants do not reference their second motion for partial summary judgment in their brief, nor do they assert the arguments contained in that motion on appeal.

$927,506. Redacted fee statements from those "[t]imekeepers" were attached to the attorney's affidavit.

Appellants responded to AIL's motion, arguing, among other things, that the fee statements provided by AIL to support its motion were "so heavily redacted, one cannot determine the reasonableness of the tasks performed." AIL later submitted unredacted copies of its fee statements to the trial court for an in camera inspection. Appellants filed an objection, arguing that any consideration by the trial court of the unredacted fee statements as evidence in support of AIL's motion for attorney's fees without giving Appellants the opportunity to review and respond to such evidence would violate Appellants' rights to due process. The trial court overruled Appellants' objection.

The trial court ultimately signed a final judgment and a first amended judgment, which incorporated the trial court's prior summary-judgment rulings. In the first amended judgment, the trial court rendered judgment for AIL against Appellants on AIL's claims for breach of contract, declaratory judgment, and attorney's fees, and it ruled that AIL was entitled to its requested remedy of specific performance. It also ruled that Appellants were to take nothing on TX Cooley Sub's counterclaim. Further, the trial court awarded AIL $927,506 in trial attorney's fees—the full amount requested by AIL. As to appellate attorney's fees, the first amended final judgment states,

12

In the event of an appeal, AIL should further recover additional fees and costs from [Appellants] in the amounts of $60,000 for an appeal to the Court of Appeals, $12,000 for a petition for writ of error to the Supreme Court, $32,000 for full briefing to the Supreme Court, and $12,000 for oral argument to the Supreme Court (collectively, the "Conditional Fees").

Appellants appeal from the first amended final judgment.

## III.  DISCUSSION

### A.  Complaints Regarding the Trial Court's Summary-Judgment Rulings

In their first, second, third, and sixth issues, Appellants complain about the trial court's summary-judgment rulings.  We will address these issues out of order.

### 1.  Standard of Review

We review a summary judgment de novo.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).  A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim.  *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).  A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to

13

summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. We should then render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

### 2. Complaint That AIL Did Not Conclusively Establish that Liberty and TX Cooley Sub Were Not "Affiliates"

In their second issue, Appellants argue that the trial court erred by making its summary-judgment rulings because AIL did not conclusively establish that Liberty and TX Cooley Sub were not "affiliates."

#### a. Applicable Law

Several precepts of law—namely, the law pertaining to the right of first refusal, the law relating to contract formation, and the parol evidence rule—intersect in our analysis of Appellants' second issue. We thus begin our analysis with a discussion of these precepts.

A right of first refusal empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser. *Archer v. Tregellas*, 566 S.W.3d 281, 286–87 (Tex. 2018). Generally, a right of first refusal

14

requires the grantor to notify the holder of its intent to sell and to first offer the property to the holder on the same terms and conditions offered by a third party. *Id.* at 287. When the grantor communicates those terms to the holder, the right of first refusal ripens into an enforceable option. *Id.* The holder may then elect to purchase the property according to the terms of the instrument granting the first-refusal right and the third party's offer, or the holder may decline to purchase the property. *Id.* When a grantor sells the burdened property to a third party without first offering it to the rightholder on the same terms and conditions, the grantor has committed a breach of contract. *Id.*

Texas has a strong public policy favoring freedom of contract. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). Absent compelling reasons, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily entered. *Id.* Generally, parties have the right to contract as they see fit. *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 59 (Tex. 2016). Thus, our primary objective in construing a contract is to give effect to the written expression of the parties' intent. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763–64 (Tex. 2018). We therefore presume that the parties intended what the words of their contract say, and we interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs us otherwise.

15

*Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888; *URI, Inc.*, 543 S.W.3d at 764. A written instrument that can be given a certain or definite meaning or interpretation is unambiguous, and we will construe it as a matter of law. *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889.

The parol evidence rule provides that, in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of an unambiguous written agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019); *Gail v. Berry*, 343 S.W.3d 520, 523 (Tex. App.— Eastland 2011, pet. denied). Indeed,

> Parties cannot rely on extrinsic evidence to give the contract a meaning different from that which its language imports[;] add to, alter, or contradict the terms contained within the agreement itself[;] make the language say what it unambiguously does not say[;] or show that the parties probably meant, or could have meant, something other than what their agreement stated.

*URI, Inc.*, 543 S.W.3d at 769 (footnotes and internal quotation marks omitted).

### b. Analysis

Here, the Deed provides that AIL's right of first refusal is triggered when the grantee "receives a bona fide offer acceptable to [it] to buy or makes a bona fide offer acceptable to the offeree to sell all or any portion of the Property." While the original grantee of the property subject to AIL's right of first refusal was Intermodal, Liberty later became the grantee when it purchased the Property at the foreclosure sale in 2015 because the right of first refusal provides that "any purchaser [of the Property]

16

at . . . a foreclosure sale shall acquire the Property subject to the First Refusal Right." As the grantee, Liberty was required to provide AIL with a Grantee's Notice setting forth the identity of the proposed purchaser, a description of the offered property, a description of all material terms of the proposed transaction, and an offer to consummate such a transaction with AIL upon the same terms and conditions as set forth in the Grantee's Notice. It is undisputed that Liberty did not provide AIL with a Grantee's Notice as required by the right of first refusal prior to the 2015 Sale.

To avoid the natural conclusion that flows from those facts—that Liberty breached the right of first refusal when it sold the Property to TX Cooley Sub— Appellants point to language in the Deed providing that the right of first refusal is not triggered by "a sale of all or any portion of the Property to an affiliate of Grantee" and argue that Appellants are "affiliates." The 2015 Sale Documents, however, conclusively establish that Appellants were not "affiliates" at the time of the 2015 Sale. In this regard, the Loan Agreement specifically states that "in no event shall [Liberty] be deemed an Affiliate of [TX Cooley Sub]." Moreover, the Promissory Note specifically disclaims any "fiduciary or special relationship between Liberty and TX Cooley Sub," and it provides that "no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between [TX Cooley Sub] and [Liberty] to be other than that of debtor and creditor."

Appellants argue that we should not substitute the Loan Agreement's definition of "affiliate" with the Deed's definition of "affiliate." The problem with that

17

argument, however, is that there is no material difference between the two definitions,[9] and Appellants do not explain how any slight difference in verbiage between the two definitions could lead to the conclusion that Appellants are "affiliates" under the Deed but not "affiliates" under the Loan Agreement.

Pointing to *Coastal Plains Development Corp. v. Micrea, Inc.*, 572 S.W.2d 285 (Tex. 1978), Appellants next argue that "the parties' characterization of their relationship in a contract is not dispositive." Thus, according to Appellants, the Loan Agreement's

---

[9]As defined in the Deed,

> [T]he term "affiliate" shall mean as to the Person . . . in question, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person in question. As used in the immediately preceding sentence, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, partnership interests, by contract or otherwise.

As defined in the Loan Agreement,

> "Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting interest of such Person, or (c) ten percent (10%) or more of the voting interest of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities, by control, or otherwise: provided, however, in no event shall [Liberty] be deemed an Affiliate of [TX Cooley Sub].

18

statement that "in no event shall [Liberty] be deemed an Affiliate of [TX Cooley Sub]" is not dispositive of whether they were "affiliates" at the time of the 2015 Sale.

In *Coastal*, the Texas Supreme Court acknowledged that "[i]t is a general rule of construction that when parties have bound themselves to an unambiguous contract, the courts will give effect to the manifest intent expressed therein." *Id.* at 287. The Court went on to say, however, that "when the record demonstrates that the actual effect of the arrangement resulting from the agreement is to create a status different from that stated in the language of the contract, the parties' designation will not control." *Id.* The Court looked at a contractual provision that expressly negated any intent on behalf of the parties to create a joint venture or partnership. *Id.* Despite that language, one of the parties attempted to establish the existence of a joint venture by showing that "such a relationship arose by the actual operation under the contractual provisions." *Id.* That party insisted that "the reality of the contractual arrangement varied from the intent expressed" in the paragraph that expressly negated the intent to form a joint venture or partnership. *Id.* The Court rejected that argument, noting that the contract did not have any agreement for sharing losses, which was essential to constitute a joint venture. *Id.* at 288. Thus, "[b]ased upon the clearly expressed intent of the parties, and the absence of any contrary provision for the sharing of losses," the Court held that the parties were not participants in a joint venture. *Id.*

19

From *Coastal*, we glean that the parties' description of their relationship in a contract does not control if the actual substance of the contract dictates a relationship other than that of the parties' description. Here, however, Appellants do not point to other provisions contained within the 2015 Sale Documents to prove that they were "affiliates" at the time of the 2015 Sale; rather, Appellants point to evidence outside of the 2015 Sale Documents in an attempt to establish their "affiliate" status. Specifically, Appellants point to Murray's delivery of the Stock Power and Stock Certificate to Liberty, claiming that Liberty's possession of those documents is evidence that TX Cooley Sub was Liberty's "affiliate." Appellants also point to testimony from Phillips that he directed Murray on how to operate TX Cooley Sub and would have removed Murray from his position if he acted without consulting Phillips and to statements from Murray that he always acted as Liberty's agent or nominee.

Citing the parol evidence rule, AIL argues that we should not look to extrinsic evidence to evaluate whether Appellants were "affiliates" at the time of the 2015 Sale because the Deed and the 2015 Sale Documents are unambiguous.[10] *See, e.g., URI, Inc.*, 543 S.W.3d at 769 (holding that parties cannot rely on extrinsic evidence to give a contract a meaning different from that which its language imports); *see also Burlington*

---

[10]Appellants do not suggest that the 2015 Sale Documents are ambiguous, nor do they argue that the 2015 Sale Documents were entered as a result of fraud, accident, or mistake. Moreover, Appellants acknowledge that the definition of "affiliate" contained in the Deed is unambiguous.

*Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019) ("Where contracts are unambiguous, [courts] decline to consider the parties' course of performance to determine [their] meaning.").

Appellants counter that AIL is not entitled to invoke the parol evidence rule because it is "a stranger" to the 2015 Sale Documents. *See, e.g.*, *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("The rule that parol evidence shall not be received to alter or contradict a written instrument applies to controversies between parties to it, and those claiming under them, but not to strangers."); *Eckel v. First Nat'l Bank of Fort Worth*, 165 S.W.2d 776, 779 (Tex. App.—Fort Worth 1942, writ ref'd) ("[T]he rule excluding parol or extrinsic evidence to vary or contradict a written instrument has no application to controversies, except those between the parties to the instruments, and their privies.").

The general rule cited by Appellants—that the parol evidence rule cannot be invoked by a stranger to a contract—is not without its limits. Indeed, the leading case cited by Appellants, *Baroid Equip., Inc.*, goes on to explain that "in some instances, the third party has been so involved with the creation of the written contract, or is claiming rights under the contract such that he is bound to abide by its terms, i.e., he is no longer a stranger to the contract." 184 S.W.3d at 13–14 (first citing *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 223–24 (Tex. 1977); and then citing *Ragland v.*

21

*Curtis Mathes Sales Co.*, 446 S.W.2d 577, 578 (Tex. App.—Waco 1969, no writ)). As

the appellate court in *Baroid Equip., Inc.* notes,

> It is commonly said that the Parol[ ] Evidence rule, in the present aspect, is binding upon only those persons who are parties to the document. This form of statement suffices in most instances to reach correct results; but it is not sound on principle.
>
> . . . .
>
> The truth seems to be, then, that the rule will still apply to exclude extrinsic utterances, even as against other parties, provided it is sought to use those utterances for the very purpose for which the writing has superseded them as the legal act.
>
> The question has been raised whether the "parol[ ] evidence rule" is applicable in favor of or against a third party who has not been a party to the written integration. The answer is definitely in the affirmative if the rule is correctly stated and understood. If two parties have by a complete written integration discharged and nullified antecedent negotiations between them, they are so discharged and nullified without regard to the identity of the person who may be asserting or denying the fact. . . .
>
> One class of cases consists of those where, in a suit involving non-parties to the instrument, some oral agreement or understanding between the parties to the instrument variant from its terms is sought to be shown. If the purpose is to show intent where that is an issue, or if the instrument is not within the rule because a mere memorandum and not an embodiment of the transaction, there can be no objection, but under similar circumstances the evidence would be admissible if the suit were between the original parties. But if the purpose be to show that the immediate legal effect of the transaction . . . was different from that expressed in the embodying instrument, . . . then the Parol[ ] Evidence Rule would apply, even though the evidence is being offered by or against a person not a party to the instrument.

*Id.* at 14 (quoting *Kingsbery v. Phillips Petroleum Co.*, 315 S.W.2d 561, 571–72 (Tex.

App.—Austin 1958, writ ref'd n.r.e.) (internal citations and quotation marks omitted)).

Here, because AIL had a right of first refusal with respect to any sale of the Property, AIL was potentially bound by the terms of the 2015 Sale Documents. *See Archer*, 566 S.W.3d at 287. Thus, we hold that AIL was not a stranger to the 2015 Sale Documents and could invoke the parol evidence rule. *See Baroid Equip., Inc.*, 184 S.W.3d at 13–14 ("[I]n some instances, the third party has been so involved with the creation of the written contract, or is claiming rights under the contract such that he is bound to abide by its terms, i.e., he is no longer a stranger to the contract."); *Kingsbery*, 315 S.W.2d at 571–72; *see also Cannon v. Pearson*, 383 S.W.2d 565, 570 (Tex. 1964) ("The plaintiffs seek to avoid [the agreement's] legal effect of releasing their cause of action for wrongful death by the tender of extrinsic evidence that it was not intended by the parties that it have that effect. The parol evidence rule bars the effort; and it matters not that the defendants who invoke the rule are not parties to the instrument.").

Because the parol evidence rule bars our consideration of the extrinsic evidence cited by Appellants, we are left with the unambiguous Deed and the unambiguous 2015 Sale Documents. When read together, those documents conclusively establish that Liberty and TX Cooley Sub were not "affiliates" at the time of the 2015 Sale. *See Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888; *URI, Inc.*, 543 S.W.3d at 764. We overrule Appellants' second issue.

23

### 3. Complaint That the 2015 Sale Did Not Trigger AIL's Right of First Refusal Because the 2015 Sale Was Not the Result of a "Bona Fide" Offer

In their first issue, Appellants argue that the 2015 Sale did not trigger AIL's right of first refusal because the 2015 Sale was not the result of a "bona fide" offer to purchase the Property. Appellants argue that the 2015 Sale was not the result of a bona fide offer because the 2015 Sale was not an arm's length transaction and did not result in a change of control over the Property.[11]

Pointing to *Jones v. Riley*, 471 S.W.2d 650 (Tex. App.—Fort Worth 1971, writ ref'd n.r.e.), both sides recognize that at least two components exist for what constitutes a bona fide offer. Those two components are that (1) the offer be made in "good faith"; and (2) the offer "be of such a nature and in such form that it could be, by an acceptance thereof by the offeree, caused to ripen into a valid and binding contract that could be enforced by any party to it." *Id.* at 659.

In their brief, Appellants suggest that a third component also exists—that the offer must be made in an arm's length transaction that results in a change of control over the property. Appellants candidly point out that this third component has not been recognized by any Texas court, although they assert that "Texas courts have yet to give a comprehensive definition of 'bona fide offer' for purposes of a right of first refusal" and indicate that Texas courts have not stated or implied that the first two

---

[11]The term *bona fide* is not defined in the Deed.

components are exclusive. Appellants point to out-of-state authority and legal commentators to support their position that this third component exists, and they ask us to adopt it. *See, e.g.*, Katy Pier Moore & John W. Ellis, *Rights of First Refusal in Texas: An Overview*, 14 Tex. J. of Oil, Gas & Energy L. 35, 38 (2019); Robert K. Wise et al., *First-Refusal Rights Under Texas Law*, 62 Baylor L. Rev. 433, 449 (2010); Harlan Albright, *Preferential Right Provisions and Their Applicability to Oil and Gas Instruments*, 32 Sw. L.J. 803, 811 (1978); *Creque v. Texaco Antilles Ltd.*, 409 F.3d 150, 154 (3d Cir. 2005); *Kroehnke v. Zimmerman*, 467 P.2d 265, 267 (Colo. 1970); *Sand v. London & Co.*, 121 A.2d 559, 561–62 (N.J. Super. Ct. App. Div. 1956).

We decline Appellants' invitation to add this third component to the meaning of the phrase *bona fide*. Texas courts—including our own—have routinely held that a bona fide offer is one that is made in good faith and which, on acceptance, becomes a valid and binding contract enforceable by any party to it. *See, e.g.*, *Jimmie Luecke Child. P'ship, Ltd. v. Droemer*, No. 03-20-00096-CV, 2022 WL 243162, at *2 (Tex. App.—Austin Jan. 27, 2022, pet. denied) (mem. op.); *Ray v. Lancaster Inv. Grp.*, No. 05-93-01857-CV, 1994 WL 416699, at *5 (Tex. App.—Dallas Aug. 5, 1994, writ denied) (not designated for publication); *Lede v. Aycock*, 630 S.W.2d 669, 674 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Jones*, 471 S.W.2d at 659. That definition comports with the plain meaning of the term *bona fide*. *See Bona Fide,* Black's Law Dictionary (11th ed. 2019) (defining *bona fide* as "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine"); *see also Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888 (holding that

25

courts are to interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the contract directs otherwise (quotation marks omitted)).

Further, we note that the Deed contains certain exclusions that would be rendered meaningless if we adopted Appellants' position. In this regard, the Deed specifically provides that neither a foreclosure sale nor a sale to an "affiliate" triggers AIL's right of first refusal. If we adopted Appellants' position and held that a bona fide offer must be made in an arm's length transaction that results in a change of control over the property, we would nullify those exclusions. *See Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889 (holding that courts are to give effect to all provisions of a contract so that none are rendered meaningless); *see also Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 695–96 (Tex. 2022) (rejecting interpretation of a contract that "would require adding words of limitation to the deed" and holding that courts "cannot rewrite or add to [an] instrument under the guise of interpretation").

Even if we were to consider this third component—that the offer must be made in an arm's length transaction that results in a change of control over the property—we would hold that the same outcome is required. Here, the 2015 Sale Documents conclusively establish that the 2015 Sale was made at arm's length. To that end, the Promissory Note specifically disclaims any "fiduciary or other special relationship" between Liberty and TX Cooley Sub, noting that "no term or condition

26

of any of the Loan Documents shall be construed so as to deem the relationship between [TX Cooley Sub] and [Liberty] to be other than that of debtor and creditor." *See 1011 McKinney Ltd. v. Credit Suisse First Boston Mortg. Cap.*, 192 S.W.3d 20, 36 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Generally, the relationship between a borrower and a lender is an arm's length business relationship."). And, as already discussed in our disposition of Appellants' second issue, we may not consider the extrinsic evidence cited by Appellants to give the 2015 Sale Documents a meaning other than that which unambiguously is stated in the documents. *See URI, Inc.*, 543 S.W.3d at 769.

The 2015 Sale Documents further establish that there was a change of control over the Property as a result of the 2015 Sale. To that end, the 2015 Sale Documents reflect a conveyance of the Property from Liberty to TX Cooley Sub, indicate that Liberty is not an affiliate of TX Cooley Sub, state that Liberty has no fiduciary or special relationship with TX Cooley Sub, reflect that nothing in the 2015 Sale Documents shall be deemed to give Liberty the right to exercise control over the affairs or management of TX Cooley Sub, and indicate that Liberty was not deemed to be or construed to be a mortgagee in possession of the Property. Once again, Appellants point to extrinsic evidence—namely, the Stock Power, Purchase Agreement, and Stock Certificate—as evidence that there was no change in control of the Property following the 2015 Sale. But, as already noted, we may not consider this extrinsic evidence to give the 2015 Sale Documents a meaning other than that which

27

unambiguously is stated in the documents.[12] *See id.* We overrule Appellants' first issue.

### 4. Complaint That AIL Did Not Conclusively Establish Its Entitlement to Specific Performance

In their third issue, Appellants argue that summary judgment should not have been granted because AIL did not conclusively establish that it was ready, willing, and able to purchase the Property on the same terms and conditions to which Liberty and TX Cooley Sub agreed.

"When a right of first refusal relating to real property is breached, rightholders most frequently seek the remedy of specific performance." *Archer*, 566 S.W.3d at 287. To be entitled to specific performance, the party seeking specific performance must plead and prove that it was "ready, willing, and able to timely perform [its] obligations under the contract." *Id.* at 287 n.8 (citing *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008)).

---

[12]Even if we were to consider this extrinsic evidence, it would still establish that there was a change of control in the Property following the 2015 Sale. To that end, Appellants' argument that there was no change in control of the Property following the 2015 Sale is based on Liberty's purported possession of the Stock Power, Purchase Agreement, and Stock Certificate. However, as acknowledged by Appellants in their brief, "[a]fter receiving the Stock Power, Stock Certificate[,] and the Purchase Agreement, Williams sent them to Winter Sun Management . . . , which handled the accounting for TX Cooley Investments and its subsidiaries." Thus, to the extent that we are inclined to look to the possession of the Stock Power, Purchase Agreement, and Stock Certificate as evidencing control of the Property, the record reflects that those documents were possessed by Winter Sun, and Appellants point to nothing in the record to indicate that Winter Sun possessed those documents on Liberty's behalf.

Here, the Deed grants AIL the right to purchase the Property "upon the same terms and conditions as set forth in the Grantee's Notice." While Appellants acknowledge that Liberty did not provide AIL with a Grantee's Notice prior to the 2015 Sale, Appellants state that the terms and conditions of the 2015 Sale included the following:

> (1) the execution and delivery of a promissory note in the amount of $1,964,384.52 bearing an interest rate of 7% for 23 months; (2) creation of a vendor's lien on the Property in Liberty's favor as security for the note; *and* (3) execution and delivery of the Stock Certificate, Stock Power, and Purchase Agreement.

In their brief, Appellants contend that AIL "did not produce any evidence, much less conclusively show, that it was ready, willing[,] and able to perform the third component of the transaction by executing and delivering to Liberty the equivalent of the Stock Certificate, Stock Power, and Purchase Agreement."[13] We reject this argument because the 2015 Sale Documents do not mention the Stock Certificate, Stock Power, and Purchase Agreement, much less require the execution and delivery of the Stock Certificate, Stock Power, and Purchase Agreement as part of the 2015 Sale. And, of course, the Grantee's Notice did not provide that third component because Liberty did not provide AIL with a Grantee's Notice prior to the 2015 Sale. *See Chambers v. Hunt Petroleum Corp.*, 320 S.W.3d 578, 583 (Tex. App.— Tyler 2010, no pet.) ("[T]he failure of the optionee to comply strictly with the terms

_____

[13]Because Appellants limit their analysis to this third component, we will do the same. *See* Tex. R. App. P. 47.1.

29

or conditions of the option will be excused when the failure is brought about by the conduct of the optionor.'").

Rather, here, AIL's summary-judgment evidence established that AIL would pay the entire $1,964,384.52 purchase price for the Property in cash. AIL's summary-judgment evidence further established that *if* it was "necessary to take [the Promissory Note]," it would pay the interest that would accrue on the Promissory Note before AIL was allowed to prepay the note.

Further, we have previously held that a buyer who has not strictly complied with the financing terms in a contract, but who is nevertheless able to meet its obligations to close a transaction, may enforce specific performance against a seller who refuses to close the transaction on the ground that the buyer did not obtain the financing on the express terms provided for in the contract. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 570 (Tex. App.—Fort Worth 2008, pet. denied) (citing *Advance Components, Inc. v. Goodstein*, 608 S.W.2d 737, 739–40 (Tex. App.—Dallas 1980, writ ref'd n.r.e.)). That principle—that specific performance is available where a buyer offers cash in lieu of financing—fits neatly with this case. Because AIL offered to pay the entire $1,964,384.52 purchase price for the Property in cash, we hold that it was ready, willing, and able to purchase the Property on the same terms and conditions to which Liberty and TX Cooley Sub agreed. *See id.*; *see also Jarvis v. Peltier*, 400 S.W.3d 644, 653 (Tex. App.—Tyler 2013, pet. denied) ("[A] party seeking specific performance of a contract for the sale of real property must prove only that

he is ready, willing, and able to pay the agreed price for the property and perform the essence of the agreement and offer to do so."). We overrule Appellants' third issue.

### 5. Complaint That the Trial Court Erred by Rendering a Take-Nothing Judgment on TX Cooley Sub's Counterclaim

In their sixth issue, Appellants argue that the trial court erred by rendering a take-nothing judgment on TX Cooley Sub's counterclaim. This issue is entirely based on Appellants' argument that AIL's right of first refusal was not triggered by the 2015 Sale. Indeed, with respect to the counterclaim, Appellants' argument is limited to the following sentences in their brief:

> The trial court's rendition of a take-nothing judgment on [TX Cooley Sub's] declaratory-judgment counterclaim was based on its erroneous conclusion that Liberty's conveyance of the Property triggered AIL's right of first refusal. This Court should reverse that judgment as well and remand for further proceedings on the counterclaim.
>
> . . . .
>
> As discussed above, the conclusion that Liberty and [TX Cooley Sub's] conveyance triggered AIL's right of first refusal also led the trial court to erroneously render a take-nothing judgment on [TX Cooley Sub's] counterclaim. This Court should reverse that judgment too and remand for further proceedings.

Because we have rejected Appellants' argument that AIL's right of first refusal was not triggered by the 2015 Sale through our overruling of Appellants' first and second issues, we likewise overrule Appellants' sixth issue.[14]

---

[14]To the extent that Appellants attempt to advance any other argument with respect to TX Cooley Sub's counterclaim, that argument is inadequately briefed. *See* Tex. R. App. P. 38.1.

31

## B. Complaints Regarding the Trial Court's Awards of Attorney's Fees

In their fourth and fifth issues, Appellants complain about the trial court's awards of attorney's fees.

### 1. Standard of Review

A party seeking its attorney's fees bears the burden of providing sufficient evidence of both the reasonable hours worked and a reasonable hourly rate. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Id.* General, conclusory testimony devoid of any real substance will not support an award of attorney's fees. *Id.* at 501. Contemporaneous billing records are not required but "are *strongly* encouraged to prove the reasonableness and necessity of requested fees when those elements are contested." *Id.* at 502.

Generally, we review a trial court's awards of attorney's fees for an abuse of discretion. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). In the proper exercise of its discretion in

awarding attorney's fees, "a trial judge is obliged to do more than simply act as a rubber-stamp, accepting carte blanche the amount appearing on the bill." *McGibney v. Rauhauser*, 549 S.W.3d 816, 821 (Tex. App.—Fort Worth 2018, pet. denied). Indeed, to discharge its responsibility, the trial court must base its award on supporting evidence. *Id.*

## 2. Complaint Regarding Trial Attorney's Fees

In their fourth issue, Appellants argue that the trial court abused its discretion by denying them the opportunity of reviewing and rebutting the evidence submitted in camera to the trial court by AIL in support of its trial attorney's fees. Appellants contend that the trial court's consideration of the unredacted fee statements violated their due-process rights.[15] *See Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S. Ct. 1011, 1021 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *City of Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238, 250 (Tex. App.—Fort

---

[15]In their brief, Appellants also contend that the trial court's consideration of AIL's unredacted fee statements violated the Texas Rules of Civil Procedure. While Appellants raised their due-process concerns to the trial court, Appellants did not raise any concern with the trial court related to a purported violation of the Texas Rules of Civil Procedure. Thus, Appellants have not preserved any complaint relating to a purported violation of the Texas Rules of Civil Procedure. *See In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.) (holding that a complaint on appeal is not preserved if it does not match the complaint the party presented to the trial court). In any event, we need not consider Appellants' complaint that the in camera submission of the unredacted fee statements violated the Texas Rules of Civil Procedure because we will hold that it violated Appellants' due-process rights. *See* Tex. R. App. P. 47.1.

33

Worth 2007, pet. denied) ("Cross-examination is a safeguard essential to a fair trial and a cornerstone in the quest for truth; longstanding principles of our jurisprudence recognize the right and necessity of full and complete cross-examination."); *see also Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (emphasizing the importance of a party opposing a request for attorney's fees having "the means and opportunity of disproving the testimony or evidence" before attorney's fees are granted).

AIL contends that "[i]n camera review of unredacted fee statements is not uncommon." AIL cites several cases in which a trial court considered unredacted fee statements in its consideration of an award of attorney's fees. *See, e.g., Boerschig v. Rio Grande Elec. Coop., Inc.*, No. 04-22-00270-CV, 2024 WL 172587, at *14 (Tex. App.—San Antonio Jan. 17, 2024, pet. filed) (mem. op.); *Challis v. Fiamma Statler, LP*, No. 02-22-00047-CV, 2023 WL 2534470, at *5 (Tex. App.—Fort Worth Mar. 16, 2023, no pet.) (mem. op.); *Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at *20, *24–25 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (mem. op.); *In re S.C.*, No. 05-18-00629-CV, 2020 WL 3046203, at *6 (Tex. App.—Dallas June 8, 2020, pet. denied) (mem. op.); *Swarovski v. Enger*, No. 05-17-00398-CV, 2018 WL 1357483, at *1, *5 n.5 (Tex. App.—Dallas Mar. 16, 2018, no pet.) (mem. op.); *Gonzales v. Sw. Radiology Ass'n & Sam Lo, M.D.*, No. 01-14-00572-CV, 2015 WL 4101371, at *4 (Tex. App.—Houston [1st Dist.] July 7, 2015, no pet.) (mem. op.); *In re Estate of Johnston*, No. 04-11-00467-CV, 2012 WL 1940656, at *4 (Tex. App.—San

Antonio May 30, 2012, no pet.) (mem. op.). We find these cases distinguishable. In none of these cases was an objection raised in the trial court regarding the in camera submission of the unredacted fee statements, and in none of them did a party raise the due-process concerns that Appellants raise in this appeal.[16]

Appellants point us to *Anders v. CrossFirst Bank*, No. 05-21-00769-CV, 2022 WL 17750549 (Tex. App.—Dallas Dec. 19, 2022, no pet.) (mem. op.) to support their argument that the trial court's consideration of the unredacted fee statements violated their due-process rights. In *Anders*, the trial court granted a plaintiff's summary judgment motion and awarded damages. *Id.* at *3. The plaintiff then moved to recover its attorney's fees. *Id.* The plaintiff submitted "heavily redacted billing records, along with declarations by its attorney, in support of its claim for attorney['s] fees." *Id.* at *6. The defendant responded that, "due to the heavy redactions, it was impossible to determine whether the hours reflected in the billing records were

---

[16]In their objection to the in camera submission of the unredacted fee statements to the trial court, Appellants argued that AIL was seeking "to cure the evidentiary deficiency" contained in its redacted fee statements without providing that evidence to Appellants' counsel. Appellants cried foul to the submission of that evidence, pointing out that if they were unable to review the unredacted fee statements, they would be unable to respond to, object to, or controvert that evidence in defending against AIL's motion for attorney's fees. Citing to both the United States and Texas Constitutions, Appellants argued that "[u]nder th[o]se circumstances, consideration of the Unredacted Fee Statements by the Court as evidence would violate [Appellants'] rights to due process." *See* U.S. Const. amend. XIV, § 1; Tex. Const. art. 1, § 19. Appellants requested that the trial court order AIL to produce the unredacted fee statements to them or, alternatively, that the trial court refuse to consider the unredacted fee statements and exclude them from the record.

35

expended reasonably." *Id.* Following a hearing where the defendant objected to the redacted records, the trial court directed the plaintiff to submit unredacted versions of the records for an in camera review. *Id.* The plaintiff submitted the unredacted records, and the trial court entered an order awarding the plaintiff attorney's fees. *Id.* On appeal, the Dallas Court of Appeals held that the defendant was entitled to review the unredacted records to controvert the expert opinion of the plaintiff's counsel. *Id.* Accordingly, the court concluded that the trial court abused its discretion in awarding the attorney's fees "without first providing [the defendant] with an opportunity to review and controvert the billing records." *Id.* at *7.

AIL claims that *Anders* is distinguishable because in that case the trial court indicated that it would review the records submitted in camera, while here, "the record does not show that the trial court actually reviewed the records." We disagree. In the first amended final judgment, prior to making its rulings, the trial court stated that it had "consider[ed] all related pleadings and filings." Thus, the record affirmatively reflects that the trial court did consider the unredacted fee statements. *See Parker v. Robert Ryan Realtors, Inc.*, No. 14-10-00325-CV, 2010 WL 4226550, at *2 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.) (holding that trial court's statement that it had "consider[ed] . . . [the appellant's] special appearance, the pleadings, the affidavits, and arguments of counsel" suggested that the trial court had considered an amended special appearance—a pleading that was on file at the time the order was signed); *Retzlaff v. Tex. Dep't of Crim. Just.*, 135 S.W.3d 731, 737–38

36

(Tex. App.—Houston [1st Dist.] 2003, no pet.) (op. on reh'g) (holding that trial court's statement that it had considered "the argument and pleadings of the parties filed herein" meant the trial court had considered all pleadings filed prior to the date of the judgment).

Thus, based on this record, we hold that the trial court abused its discretion by considering the unredacted fee statements submitted to it in camera as part of its consideration of the trial attorney's fees because Appellants were not provided with those documents and, thus, could not controvert them. *See Anders*, 2022 WL 17750549, at *6–7; *CSFB 1998-PI Buffalo Speedway Off., Ltd. P'ship v. Amtech Elevator Servs. Co.*, No. 01-08-00639-CV, 2010 WL 3294287, at *7 (Tex. App.—Houston [1st Dist.] Aug. 19, 2010, no pet.) (Massengale, J., concurring) (mem. op.) ("Whatever reasons may have motivated CSFB to offer its billing records to the trial court in camera, it has provided this court no authority approving a process of supporting a fees request with records that have been withheld from the opposing party."); *see also Goldberg*, 397 U.S. at 269, 90 S. Ct. at 1021; *Ragsdale*, 801 S.W.2d at 882; *Centerfolds, Inc.*, 232 S.W.3d at 250.

Having found error, we now turn to harm. To obtain reversal of a judgment based on an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). Here, the trial

37

court stated, prior to making its rulings, that it had "consider[ed] all related pleadings and filings." That would necessarily include the unredacted fee statements that were submitted in camera. While the trial court improperly considered those unredacted fee statements, we cannot ascertain the extent to which the trial court's award of trial attorney's fees was based on that consideration. Thus, we hold that Appellants have demonstrated harm. *See In re C.A.Y.*, No. 04-05-00302-CV, 2006 WL 228714, at *4 (Tex. App.—San Antonio Feb. 1, 2006, pet. denied) (mem. op.) ("Harm may exist when the circumstances of a case require an appellant to guess the reason the court ruled as it did."); *Jones v. Enter. Leasing Co. of Hous.*, No. 01-96-01174-CV, 1999 WL 191409, at *2 (Tex. App.—Houston [1st Dist.] Apr. 8, 1999, no pet.) (not designated for publication) ("Harm occurs when the trial court's error prevents the party from properly presenting his case to the court of appeals, that is, when the party is forced to guess as to the trial court's reasons for its judgment."); *see also Young v. Qualls*, 223 S.W.3d 312, 313 (Tex. 2007) ("Because we cannot tell whether the erroneous damages award affected the trial court's determination of attorney's fees, we reverse in part the court of appeals' judgment and remand this case for a new trial on attorney's fees.").

AIL claims that Appellants cannot demonstrate harm, pointing out that the redacted fee statements also provide a basis for the trial court's award of trial attorney's fees. Those redacted fee statements have their own problems, however,

38

due to the over-redaction seen in those statements. For example, the redacted fee statements include the following entries:

- Final edits to [redacted] send to [redacted] confer with Chad Key on [redacted] 1.50 [hours];

- Review of [redacted] 1.20 [hours];

- Send [redacted] review and analyze [redacted] 1.10 [hours];

- Review and revise [redacted] 0.30 [hours];

- Review of [redacted] and forward to [redacted] review [redacted] 1.60 [hours];

- Receive and review [redacted] confirm with [redacted] 1.20 [hours]; and

- Initial review of [redacted] correspondence to [redacted] 3.20 [hours].

Those entries are "so heavily redacted that the trial court could not possibly have had sufficient evidence to determine that the entire amount requested was not excessive or extreme, but rather moderate or fair." *McGibney*, 549 S.W.3d at 821 (citation and internal quotation marks omitted); *see id.* at 822 (holding that billing entries stating "[r]eview [Redacted]" and "[r]eview and respond [Redacted]" were "so heavily redacted as to be meaningless"). And given that the trial court awarded the full amount of trial attorney's fees requested by AIL, harm seems evident—either the trial court considered the unredacted fee statements in part without Appellants being given a chance to review and controvert them or the trial court relied on redacted fee

39

statements that were so heavily redacted as to be meaningless. We sustain Appellants'
fourth issue.

### 3. Complaint Regarding Appellate Attorney's Fees

In their fifth issue, Appellants argue that the trial court erred by granting AIL
an unconditional award of appellate attorney's fees. *See Sundance Mins., L.P. v. Moore*,
354 S.W.3d 507, 515 (Tex. App.—Fort Worth 2011, pet. denied) ("[A]n award of
appellate attorney's fees must be conditioned on any appeal's being unsuccessful.").
Appellants request that we modify the judgment "to state that AIL may only recover
its appellate attorney's fees if [Appellants'] appeals to this Court or the Texas Supreme
Court are unsuccessful." AIL responds that Appellants' complaint is "technical and
unnecessary," and AIL points out that "Appellants proposed the same language the
trial court adopted on this issue—thereby inviting the error." Nevertheless, AIL
agrees that we can modify the appellate attorney's award to make it explicit that it is
contingent on AIL's success on appeal.

While both parties suggest modification of the trial court's award of appellate
attorney's fees, we cannot do so because we are reversing the trial court's award of
trial attorney's fees; in such a situation, we must remand the issue of appellate
attorney's fees to the trial court for redetermination in light of Appellants' partial
success on appeal. *See Siana Oil & Gas Co. LLC v. White Oak Operating Co., LLC*,
No. 01-21-00721-CV, 2022 WL 17981572, at *15 (Tex. App.—Houston [1st Dist.]
Dec. 29, 2022, no pet.) (mem. op.) ("[W]e remand the issue of the amount of

40

appellate attorney's fees for the trial court to determine the reasonable amount of appellate attorney's fees to be awarded to [the appellee] in light of [the appellant's] partial success in this appeal."); *Taylor Morrison of Tex., Inc. v. Fulcher*, No. 13-20-00332-CV, 2022 WL 3092553, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, pet. denied) (mem. op.) (reversing and remanding award of appellate attorney's fees for redetermination because appellant was partially successful on appeal); *Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 918 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[The appellee] does not oppose the reformation of the judgment to expressly condition the award of appellate attorney's fees upon [the appellant's] success on appeal; however, in light of our reversal of [the appellee's] disgorgement award, the case must be remanded for a redetermination of the appropriate award of fees."). We sustain Appellants' fifth issue.

## IV. CONCLUSION

Having overruled Appellants' first, second, third, and sixth issues, we affirm the trial court's granting of summary judgment to AIL on its claims and the take-nothing judgment on TX Cooley Sub's counterclaim. Having sustained Appellants' fourth and fifth issues, we reverse the trial court's awards of attorney's fees and remand for further proceedings consistent with this opinion.

/s/ Dana Womack
Dana Womack
Justice

Delivered: June 6, 2024

41